FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   SEP 3 0 2015   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SHERRI MARTIN,

                    Plaintiff,

          -against-                                    **ORDER**
                                                       14-CV-0843

CAROLYN W. COLVIN,
Acting Commissioner, Social Security
Administration,

                    Defendant.
-----------------------------------------------------------X
FEUERSTEIN, J.

     Plaintiff Sherri Martin ("Plaintiff" or "Martin") commenced this action pursuant to 42

U.S.C. §§ 405(g) and 1383(c), seeking judicial review of the final determination of defendant

Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying

Plaintiff's application for disability insurance benefits and supplemental security income. Now

before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the Commissioner's

motion is granted, and Martin's motion is denied. The Commissioner's September 27, 2012

decision denying disability insurance benefits and supplemental security income to Plaintiff is

affirmed.


## TABLE OF CONTENTS

I.     **BACKGROUND** ................................................................................2
     *A.*   *Administrative Proceedings* .............................................2
     *B.*   *Non-Medical Evidence* ....................................................3
     *C.*   *Medical Evidence* ...........................................................4
     *D.*   *The ALJ's Decision* ........................................................14

II.    **DISCUSSION** ...............................................................................15

    A.    *Standards of Review* ........................................................................................15
           1.    Rule 12(c) ............................................................................15
           2.    Review of the Commissioner's Decision ...................................16
    B.    *Evaluation of Disability* ...................................................................................17
           1.    Statutory Definition of Disability ...............................................17
           2.    Five-Step Sequential Analysis of Whether Claimant is Disabled .............18
    C.    *Review of the ALJ's Decision* ..........................................................................20
           1.    Dr. Koenig's Opinion ..............................................................20
           2.    Dr. Pollack's Opinion .............................................................21
           3.    Expert Medical Testimony on Plaintiff's RFC ...........................22
           4.    Developing the Record ............................................................23
    D.    *Affirming the Commissioner's Decision* .............................................................24

III.    **CONCLUSION** ...............................................................................................24

# I.    BACKGROUND

## A.    *Administrative Proceedings*

Plaintiff has previously filed two (2) applications with the Social Security Administration seeking disability insurance benefits under Title II of the Social Security Act ("Act") and supplemental security income ("SSI") under Title XVI of the Act. She filed her applications for disability benefits and SSI sometime in 2003 or 2004. [Dkt. No. 19, Transcript of Administrative Record ("Tr.") at 27]. Administrative law judge ("ALJ") Cohen denied those applications on December 10, 2010, and the Appeals Council ("AC") subsequently denied Plaintiff's request for a review of ALJ Cohen's decision. *Id.* at 42, 49. The Commissioner's decision on Plaintiff's first two (2) applications for disability benefits and SSI thus became final on December 10, 2010.

On April 1, 2011, Plaintiff filed two (2) new applications for disability benefits and SSI. *Id.* at 40. In her applications, she indicated that the alleged onset date of her disability began on March 15, 2008. *Id.* at 49. The Social Security Administration denied her claims on June 27,

2011. *Id.* at 69. Plaintiff then requested a hearing before an ALJ, and a hearing was held on September 18, 2012 before ALJ Andrew Weiss ("Weiss"). *Id.* at 24. ALJ Weiss denied Plaintiff's applications in a September 27, 2012 written decision. *Id.* at 49. The AC then declined to review ALJ Weiss's decision on December 2, 2013, *see id.* at 63, rendering ALJ Weiss's September 27, 2012 decision the final decision of the Commissioner.

Plaintiff now appeals the Commissioner's September 27, 2012 decision denying her disability insurance benefits and SSI under Titles II and XVI of the Act.


### B.    *Non-Medical Evidence*

Martin was born in 1977 and was thirty-five (35) years old on the date of ALJ Weiss's decision. *Id.* at 26. She completed high school, and her last date of employment was in March or May 2008. *Id.* at 13, 27. Although she previously applied for disability benefits in 2003 or 2004, she worked between 2004 and 2008. *Id.*

During the September 27, 2012 ALJ hearing, Plaintiff testified that she felt disabled due to pain in her shoulder, neck, and back. *Id.* at 29. She added that she "lost her memory" from 2001 to 2004 as a result of an electric shock she received while working in 2001. *Id.* In 2004, she worked as a supervisor at K-Mart and as a cashier at Waldbaum's until 2008. *Id.* at 28. She later left those two (2) jobs to take care of her son.

Plaintiff is a single mother who has one (1) son, aged 14, at the time of the ALJ hearing. *Id.* Because of Plaintiff's physical ailments, her son does the cooking and cleaning and helps her shop. *Id.* at 29. Plaintiff has never driven, but takes public transportation. *Id.* at 32-34. Plaintiff can dress herself, but needs her son's help to put on shoes or to tie her shoelaces. *Id.* at 36. She

3

cannot grip a button or use a zipper due to her pain. *Id.* She has taken various medications for her pain; some have been ineffective and others have caused hallucinations. *Id.* at 34.

During a June 10, 2011 consultative examination, however, Plaintiff had indicated that she could shower and dress herself, as well as cook, clean, wash laundry, and shop. *Id.* at 539. Similarly, in a May 17, 2011 report, Plaintiff had represented that she could shower, take care of her son, prepare some meals, shop, and travel unaccompanied by either walking or using public transportation. *Id.* at 578.


### C.  *Medical Evidence*

In 2001, while at work, Plaintiff was injured by an electrical shock to her right index finger and treated for complex regional pain syndrome affecting her right upper extremity. *Id.* at 209, 222; *see id.* at 378 (describing Plaintiff's medical history). On August 19, 2002, she had surgery for a rotator cuff tear and labrum degeneration. *Id.* at 219.

On February 28, 2005, Plaintiff was diagnosed with a frozen shoulder and possible sensory nerve injury. *Id.* at 378. At a follow-up appointment on April 16, 2005, Dr. Norman Pilaster noted "a paucity of objective findings" and assessed Plaintiff's right shoulder pain as likely mechanical with neuropathic components. *Id.* at 376.

On June 13, 2008, Dr. Mark Koenig ("Dr. Koenig") saw Plaintiff for an initial evaluation. *Id.* at 333. Plaintiff was presented as 5'6" tall and 233 pounds, and her examination was largely unremarkable with no swelling in her extremities. *Id.* Dr. Koenig referred Plaintiff to a surgeon for additional testing. *Id.* at 334.

4

On July 16, 2009, Dr. Jeffrey Goldstein examined Plaintiff for right shoulder and wrist pain, although she also complained of back, hip, and knee pain. *Id.* at 330. Plaintiff had normal gait and full passive range of motion in her wrists, arms, and fingers, with no evidence of atrophy. *Id.* at 331. She also complained of early fatigability, as well as pain and weakness in all dermatomes with active motion. *Id.* Plaintiff was diagnosed with a possible rotator cuff tendonitis or tear with tendonitis of the hand, or possible neurological defect. *Id.* Her right shoulder x-rays also showed prior surgical changes, but were otherwise unremarkable. *Id.*

On August 20, 2009, Plaintiff sought treatment for pain in her right arm, neck, shoulder, and back after she had dropped a bucket that she had been carrying. *Id.* at 248. She had a decreased active range of motion, but normal passive range of motion. *Id.* Her medical examination was otherwise unremarkable. *Id.*

On August 26, 2009, Dr. James Bruno ("Dr. Bruno"), a neurologist, examined Plaintiff for right arm numbness and tingling that she complained of having had for the past nine (9) years. *Id.* at 327. Plaintiff also complained of an altered sensation on the right side of her face as well as right upper extremity weakness. *Id.* A nerve conduction study revealed no evidence of neuropathy except for "very early" carpal tunnel on her left side. *Id.* Plaintiff was ambidextrous and had her right arm in a sling. *Id.* She was alert and oriented with good attention and normal language. *Id.* An MRI of her cervical spine revealed disc bulges at C5-C6 and C6-C7 and a slight reversal of the cervical curvature. *Id.* at 329. Plaintiff was prescribed Topamax. *Id.* at 328.

On September 11, 2009, Plaintiff had another appointment with Dr. Bruno. *Id.* at 322. Plaintiff was alert and oriented with good attention and normal language. *Id.* She had limited

5

abduction in her right arm, with nearly full biceps and triceps strength, but slight (4/5) diffuse weakness in the intrinsic muscles of her hand. *Id.* at 323. An MRI of her right shoulder also revealed trace to minimal effusion and supraspinatus tendinosis. *Id.* at 324. Dr. Bruno replaced Plaintiff's prescription for Topamax with Lyrica. *Id.* at 322.

On September 25, 2009, Plaintiff again visited Dr. Bruno. *Id.* at 325. She still had limited adduction, but her hand weakness had subsided. *Id.* Dr. Bruno increased Plaintiff's dose of Lyrica, but suggested that a differential diagnosis might include "secondary gain." *Id.* at 326.

On March 27, 2010, Plaintiff sought emergency treatment for right arm, chest, and back pain. *Id.* at 432, 522. Plaintiff was alert, oriented, and appeared to be in mild discomfort. *Id.* at 531. She was diagnosed with chronic pain syndrome, and Flector patches were prescribed. *Id.* at 536.

On April 1, 2010, Plaintiff had another appointment with Dr. Koenig. *Id.* at 334. When Plaintiff returned several days later to see a registered physician assistant ("PA"), Patricia Wetsell, Plaintiff's neck and shoulder were tender, and she wore a sling on her right arm and had a decreased range of motion. *Id.* Physical therapy was prescribed. *Id.*

On April 30, 2010, Plaintiff was treated at Dr. Koenig's office for treatment of acute bronchitis. *Id.* at 336. When Plaintiff next saw PA Wetsell on May 4, 2010, Plaintiff complained of back, neck, and shoulder pain, as well as depression. *Id.* at 337. Her examination was unremarkable, and PA Wetsell again referred Plaintiff to physical therapy and for a neurological consultation. *Id.* at 344.

Also on April 30, 2010, Dr. Koenig completed an employability assessment form of Plaintiff for submission to the Department of Social Services. *Id.* at 380. He diagnosed Plaintiff

6

with asthma and chronic neck, shoulder, and back pain, for which he had treated Plaintiff since June 2008. *Id.* Dr. Koenig indicated that Plaintiff could not walk, stand, sit, push, pull, or bend for more than two (2) hours, could carry ten (10) pounds occasionally, was limited in using her right hand, and had no limitation in her ability to see, hear, speak, or use public transportation. *Id.* at 381. He found that Plaintiff could not life, push, pull, sit, or stand for any long period of time. *Id.* He recommended that Plaintiff's ability to participate in work activities be reevaluated in six (6) weeks and referred Plaintiff to physical therapy. *Id.*

On May 7, 2010, Plaintiff sought physical therapy for intermittent pain in her spine that worsened with movement and occasionally radiated to her hand. *Id.* at 313. The physical therapist noted that Plaintiff had decreased range of motion in her right shoulder and cervical spine, decreased strength, and positive Spurling and right shoulder impingement tests. *Id.* Plaintiff also complained of difficulty carrying and holding objects. *Id.* By May 18, 2010, Plaintiff reported to PA Wetsell that physical therapy had been somewhat helpful with her range of motion. *Id.* at 345.

On June 29, 2010, Plaintiff was examined by another physical therapist. *Id.* at 289. Plaintiff had slightly increased strength in her cervical spine but complained of difficulty bathing, dressing, and opening jars and containers with her right hand. *Id.*

On July 8, 2010, Plaintiff was treated for diffuse pain on her right side. *Id.* at 427. Plaintiff was fully oriented and not in obvious discomfort. *Id.* at 429. Plaintiff had right shoulder, arm, and leg tenderness, but she also had intact sensation, motor strength, and normal affect. *Id.* at 429. Toradol and Percocet were prescribed. *Id.*

7

On July 13, 2010, Plaintiff's insurance company determined that physical therapy treatments for Plaintiff were not medically necessary. *Id.* at 290.

On July 22, 2010, Plaintiff again complained of neck tenderness to PA Wetsell and reported that she had twisted her ankle, but PA Wetsell determined that Plaintiff had full range of motion in both areas. *Id.* at 351. Plaintiff also had decreased forward flexion in her back but denied there was any tenderness. *Id.* Ankle x-rays on August 4, 2010 revealed no evidence of fracture, but they did indicate some incidental calcific Achilles tendonitis. *Id.* at 347.

On September 3, 2010, Plaintiff went to the hospital complaining of pain and muscle spasms in her neck, back, and right arm. *Id.* at 421. Plaintiff was in obvious mild discomfort and was prescribed Valium, Percocet, and Toradol. *Id.* at 423. She also had a muscle spasm on the right side of her neck, trapezius, and upper arm, but only mild tenderness in her right neck muscles and no tenderness in her back or upper extremities. *Id.* at 424.

On October 11, 2010, Plaintiff again sought treatment for back pain. *Id.* at 353, 416. Plaintiff was in obvious mild discomfort and prescribed Dilaudid. *Id.* at 418. Plaintiff's pain was described as "moderate," and she was prescribed Flexeril. *Id.* at 417. Plaintiff did not have any tenderness and also had normal affect. *Id.* She was diagnosed with back pain. *Id.* at 420.

On October 19, 2010, Plaintiff saw PA Wetsell with continuing complaints of back pain. *Id.* at 352. Plaintiff's lumbar spine was tender to palpation, and she had decreased range of motion. *Id.* A straight leg raising test was negative. *Id.* Plaintiff was diagnosed with chronic low back pain and told to continue using Robaxin with moist heat and gentle stretching. *Id.*

On October 22, 2010, Plaintiff saw Dr. Philippe Vaillancourt for complaints of pain to her right side. *Id.* at 372. She had antalgic gain, with right shoulder depression and protraction,

8

flattening of the dorsal spine, and left foot pronation. *Id.* at 373. She also had a restricted range of motion in her neck, right shoulder, lower back, right hip, and left big toe, with diffuse muscle spasms and weakness across all major joints on the right side. *Id.* Plaintiff was diagnosed with fibromyalgia, and cyclobenzaprine and physical therapy were prescribed. *Id.* at 374. Plaintiff's examination findings remained largely unchanged at other medical appointments through November 22, 2010. *Id.* at 368-71.

A lumbosacral spine x-ray conducted on November 5, 2010 revealed a minimal spondylosis, but it was otherwise unremarkable. *Id.* at 348. A cervical spine MRI conducted on December 2, 2010 revealed a straightening to mild reversal of the cervical lordosis and a "minute" focal central disc protrusion at C6-C7, as well as a possible subcutaneous cyst. *Id.* at 349. A right shoulder MRI on the same date revealed post-surgical changes and rotator cuff tendinopathy. *Id.* at 350.

On December 17, 2010, Plaintiff was again treated at the hospital for complaints of back pain radiating to her legs. *Id.* at 411. Plaintiff was fully oriented and in no obvious discomfort. *Id.* at 413. Plaintiff later appeared to be in severe discomfort when examined by the doctor, but she was able to ambulate and had no tenderness to palpation with intact motor and sensory examinations. *Id.* at 414. She was prescribed Dilaudid and Flexeril. *Id.*

On December 18, 2010, Dr. Koenig examined Plaintiff again for complaints of right shoulder and lower back pain. *Id.* at 355. Plaintiff's neck, back, and right shoulder were tender, with a decreased range of motion in her shoulder. *Id.* She reported being diagnosed with fibromyalgia and treated with Savella. *Id.* Dr. Koenig prescribed cyclobenzaprine and referred Plaintiff for pain management. *Id.*

9

On January 3, 2011, Plaintiff was examined by nurse practitioner Patricia Grant ("Grant") for complaints of pain to her right side. *Id.* at 366. Plaintiff had antalgic gain, with right shoulder depression and protraction, flattening of the dorsal spine, and left foot pronation. *Id.* She also had restricted range of motion in her neck, right shoulder, lower back, right hip, and left big toe, with diffuse muscle spasms and weakness across her major joints on the right side. *Id.* Plaintiff was taking Flexeril and prescribed Savella with continued physical therapy. *Id.* at 366.

On February 3, 2011, Plaintiff sought treatment at the hospital after taking a fall. *Id.* at 402. She was in mild discomfort and had swelling in her right ankle and tenderness in her left knee. *Id.* at 404. Her knee x-rays were unremarkable, and her ankle x-rays revealed minimal soft tissue swelling. *Id.* at 407.

On February 17, 2011, Plaintiff reported to nurse practitioner Grant that her mood, quality of life, and level of function were all "much better," and that her pain was "tolerable." *Id.* at 364. Her "condition ha[d] significantly improved" and the prescription Savella had been "quite effective and well tolerated." *Id.* Nurse practitioner Grant prescribed Tramadol and Mobic in addition to Savella for Plaintiff. *Id.* at 365.

On February 19, 2011, Plaintiff sought treatment at the hospital for vomiting, which was diagnosed as being "most likely . . . viral." *Id.* at 389.

On March 21, 2011, Plaintiff complained of an exacerbation of her right shoulder and lower back pain. *Id.* at 362. An increased dose of Savella, as well as Lidoderm and Flector patches, were prescribed. *Id.* at 363. Plaintiff's condition remained stable through April 18, 2011. *Id.* at 360. On March 21, 2011, nurse practitioner Grant also completed a medical report for Plaintiff for submission to the Department of Social Services in which Plaintiff was

10

diagnosed with fibromyalgia and lower back pain. *Id.* at 358. Grant noted diffuse myofascial pain, with right rotator cuff tendinopathy and polyarthralgia that was worse on Plaintiff's right side. *Id.* Grant also indicated that Plaintiff reported a marked restriction in Plaintiff's daily activities. *Id.* Grant checked off boxes stating that Plaintiff was unable to work, significant improvements were unlikely through medical treatment or rehabilitation, and Plaintiff's impairments could be expected to last for more than a year. *Id.*

On May 6, 2011, Plaintiff again sought treatment at the hospital for back pain. *Id.* at 383. Plaintiff was in no obvious discomfort but had some pain with lumbar palpation. *Id.* at 385.

On June 10, 2011, Dr. Andrea Pollack ("Pollack") performed a consultative internal medicine examination of Plaintiff. *Id.* at 538. Plaintiff complained of neck, back, right shoulder, arm, and leg pain, for which she took Mobic, Savella, and Flexeril. *Id.* at 538. She indicated that she could cook, clean, do laundry, shop, shower, and dress herself. *Id.* at 539. She also watched television, listened to the radio, and socialized with friends. *Id.*

Dr. Pollack reported that Plaintiff's gait and stance were normal. *Id.* Plaintiff could rise from a chair without assistance, walk on her heels and toes without difficulty, and squat halfway. *Id.* She did not need any help changing or getting on or off the examination table. *Id.* Plaintiff had limited cervical lumbar motion and right arm motion, but otherwise had full range of motion of her shoulders, elbows, forearms, wrists, hips, knees, and ankles. *Id.* at 540. Her joints were stable and non-tender. *Id.* She had no sensory deficit and full (5/5) strength throughout, with intact hand and finger dexterity and full (5/5) grip strength. *Id.* Cervical spine x-rays showed some tightening but was otherwise unremarkable. *Id.* at 542. Lumbar spine x-rays were negative. *Id.* at 543.

Dr. Pollack diagnosed Plaintiff with right arm pain, chronic neck to lower back pain with radiation, and asthma. *Id.* at 540. The doctor opined that Plaintiff had a moderate restriction for lifting, carrying, pushing, pulling, bending, and squatting. *Id.* at 541.

On June 23, 2011, Plaintiff sought hospital treatment for right shoulder and back pain, for which she was prescribed Percocet. *Id.* at 602. Plaintiff complained of pain with range of motion, but her examination was largely unremarkable, with normal strength despite complaints of chronic weakness. *Id.* at 604.

On August 2, 2011, Plaintiff complained of difficulty with her physical therapy, but an increased dose of Savella was effective and well tolerated. *Id.* at 618. She also took Mobic and Flexeril. *Id.* Plaintiff had an antalgic gait, right shoulder depression and protraction, left foot pronation, and a flattening of the dorsal spine, as well as numbness, weakness, and diffuse muscle spasms on the right side, and restricted range of motion in her right shoulder and hip, neck, lower back, and left big toe. *Id.* at 619. Plaintiff's prescription for Mobic was discontinued and substituted with Lyrica. *Id.*

On August 7, 2011, Plaintiff again sought hospital treatment for pain on her right side. *Id.* at 621. She was prescribed Percocet and Valium. *Id.* Her examination was unremarkable, with intact strength and sensation and no joint tenderness. *Id.* at 625. Plaintiff described her pain as moderate. *Id.*

On August 11, 2011, Plaintiff saw physical therapist Garry Kushnir for an initial consultation. *Id.* at 636. During her examination, Plaintiff displayed poor posture and abdominal tone, walked with a wide base and ataxia (or poor coordination) and had limited motion in her right knee, shoulder, and elbow. *Id.* Plaintiff continued with her physical therapy

and was reassessed on September 16 and November 9, 2011 and January 11, 2012. *Id.* at 641. Her medical condition remained largely unchanged, except that range of motion in her ankle and knee increased and ataxia was no longer observed. *Id.*

On December 28, 2011, Plaintiff returned to the hospital with complaints of back and right side pain. *Id.* at 639. She appeared to be in discomfort and was prescribed Dilaudid and Zofran. *Id.* at 640.

On February 11, 2012, Plaintiff was treated at the hospital after she "stopped talking and couldn't move [her] arm and leg" while at physical therapy. *Id.* at 663. Plaintiff was initially mute with "flat" behavior, but was alert and fully oriented when assessed a few hours later. *Id.* at 660. She had some weakness and mild sensory loss. *Id.* When those conditions were resolved, Plaintiff's main complaint was her right shoulder pain. *Id.* at 663. A neurologist assessed Plaintiff as most likely having somatoform disorder. *Id.* at 672.

On May 22, 2012, State agency physician Mary Lanette Rees ("Rees") reviewed Plaintiff's file and completed a case analysis after Plaintiff's representative was given an opportunity to submit additional evidence. *Id.* at 681. Dr. Rees noted Plaintiff's "long history" of back and shoulder pain but concluded that the overall medical findings supported a June 27, 2011 assessment by a non-physician State agency analyst. *Id.* at 682. That assessment concluded that Plaintiff could lift ten (10) pounds frequently and twenty (20) pounds occasionally, stand and/or walk for about six (6) hours in an eight (8) hour day, sit for six (6) hours in an eight (8) hour day, and was limited in her ability to push and/or pull with her upper extremities. *Id.* at 613.

On September 12, 2012, Dr. Shafi Wani and certified PA Gina Guschel reported treating Plaintiff for "chronic pain of the fibromyalgia type." *Id.* at 683. They noted that Plaintiff had been prescribed anti-inflammatory medications, muscle relaxants, and trigger point injections, but had failed treatment with Gabapentin and Cymbalta. *Id.*

### D. The ALJ's Decision

As an initial matter, the ALJ's decision was limited to the time period between December 11, 2010 (the day after the AC denied review of Plaintiff's first two (2) applications) and September 27, 2012 (the date of the subsequent ALJ decision on Plaintiff's second two (2) applications).[1] Applying the five (5)-step sequential analysis set forth in C.F.R. § 404.1520, the ALJ found that: (1) Plaintiff had not engaged in "substantial gainful activity" during the alleged period of disability; (2) Plaintiff had the following "severe" impairments: (i) cervical spine disorder, (ii) lower back pain, (iii) a history of electrocution of the right middle finger, (iv) right shoulder disorder status post-2002 arthroscopy, (v) status post excision of a pilonidal cyst, (vi) fibromyalgia, and (vii) carpal tunnel syndrome of the right hand; (3) Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had the residual functional capacity ("RFC") to perform the full range of "sedentary work" defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a); (5) Plaintiff could not perform her past relevant work as a

---

[1] When a plaintiff has filed a previous unsuccessful application for benefits, the period at issue begins from the day after the date of the earlier decision by the Commissioner denying the plaintiff's application, rather than from the plaintiff's alleged onset date of disability. Tr. at 49 (applying *res judicata* and holding that disability period extends from day after Commissioner's earlier decision and not from plaintiff's alleged onset date); *see also* 20 C.F.R. §§ 404.955, 416.1455 (providing that an ALJ's decision is binding unless appealed or revised/reopened).

cashier; and (6) Plaintiff was thirty (30) years old, had a high school education, and was able to communicate in English. *Id.* at 49-57.

The ALJ concluded that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform sedentary jobs that exist in significant numbers in the national economy. *Id.* at 56. Accordingly, the ALJ held that Plaintiff was "not disabled" under Sections 216(i) and 223(d) of the Act for purposes of being eligible for disability insurance benefits, and Plaintiff was "not disabled" under Section 1614(a)(3)(A) of the Act for purposes of being eligible for SSI, during the time period at issue. *See id.* at 57.

## II.    DISCUSSION

### A.    *Standards of Review*

#### 1.    Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Id.* at 679. The court is limited "to facts stated on the face of the complaint, in documents appended to

the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

### 2. Review of the Commissioner's Decision

Upon review of the final decision of the Commissioner, a court may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial

evidence. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law might have affected the disposition of the case." *Id.* at 189. If so, the Commissioner's decision must be reversed. *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

## B. *Evaluation of Disability*

### 1. Statutory Definition of Disability

Pursuant to 42 U.S.C. § 423(d)(1)(A), the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

17

42 U.S.C. § 423(d)(2)(A).

## 2. Five-Step Sequential Analysis of Whether Claimant is Disabled

Pursuant to regulations promulgated under the Social Security Act, the Commissioner is required to apply a five (5) step sequential analysis to determine whether an individual is disabled under the Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity" "is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a

18

continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant is not found to be disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other

work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work, the claimant is not disabled. *Id.* If the claimant cannot make an adjustment to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving first four (4) steps of the sequential analysis, while the Commissioner bears a limited burden at the fifth and last step. *See Talavera*, 697 F.3d at 151.

### C. *Review of the ALJ's Decision*

The ALJ determined that Plaintiff had the RFC to perform the full range of "sedentary work" defined under 20 C.F.R. §§ 404.1567(a) and 416.967(a). Tr. at 52. "Sedentary work" is defined as work that:

> [I]nvolves lifting no more than [ten] 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

Plaintiff argues that the ALJ erred in his decision by: (1) allegedly failing to credit Dr. Koenig's RFC assessment of Plaintiff; (2) assigning significant weight to Dr. Pollack's opinion that was based on an allegedly incomplete record of Plaintiff's medical history; (3) failing to obtain expert medical testimony on Plaintiff's RFC; and (4) failing to develop a proper record by not sufficiently inquiring into Plaintiff's medical conditions at the hearing. Tr. at 16, 17, 19, 21.

### 1. Dr. Koenig's Opinion

Plaintiff contends that the ALJ failed to give proper credit to Dr. Koenig's medical opinion in the ALJ's decision. Pl.'s Br. at 16. Specifically, although Dr. Koenig examined Plaintiff on December 18, 2010, Dr. Koenig also previously completed an assessment of Plaintiff's RFC on April 30, 2010. *Id.* at 16-17. Plaintiff contends that the ALJ erred by failing to consider that April 30, 2010 RFC assessment in his ruling. *Id.* at 17. However, as Plaintiff herself acknowledges, the April RFC assessment occurred outside the relevant time period, which ran from December 11, 2010 through September 27, 2012. *Id.* ("We acknowledge that this evaluation was completed during the time period previously adjudicated by ALJ Cohen."). The ALJ therefore lacked authority to consider Dr. Koenig's initial RFC assessment of Plaintiff.

### 2. Dr. Pollack's Opinion

Plaintiff next claims that the ALJ erred by according significant weight to consultative examiner Dr. Pollack's medical opinion. Pl.'s Br. at 17. According to Plaintiff, Dr. Pollack's opinion was flawed, because Dr. Pollack lacked knowledge that Plaintiff "had been hospitalized numerous times during the period of adjudication . . . for pain and weakness, specifically related to her neck, back, and right upper extremity." *Id.* at 18. However, Plaintiff cites to transcript pages which contain only hospital emergency room visits. *See* Tr. at 352, 383-87, 421-36, 602-11, 621-34, 640, 658-72. For instance, on May 6, 2011, Plaintiff sought emergency care for back pain. Tr. at 383. She was prescribed medication and discharged several hours later; she was not admitted to the hospital or kept overnight for observation. *Id.* Another visit to the hospital stemmed from Plaintiff's nausea and vomiting that was "most likely . . . viral" and thus unrelated to her disability and SSI claims. *Id.* at 389, 394. Plaintiff's characterization of her various

21

"hospitalizations" is therefore misleading and not entirely consistent with the record. In any event, Dr. Pollack's records properly noted Plaintiff's "hospitalization" history as Plaintiff recited to Dr. Pollack at the time of Plaintiff's medical examination. *Id.* at 538.

Plaintiff further alleges that Dr. Pollack's opinion was incorrect, because it did not provide a direct assessment of Plaintiff's ability to sit, stand, or walk. Pl.'s Br. at 19. Although Dr. Pollack's medical notes do not provide an explicit assessment of Plaintiff's ability to sit, stand, or walk, the medical notes do generally indicate that Plaintiff suffers from no such particular physical limitations. Tr. at. 538. For example, Dr. Pollack opined that Plaintiff "is able to cook, clean, do laundry, and shop. She is able to shower and dress herself." *Id.* at 539. Furthermore, "[t]he claimant appeared to be in no acute distress. *Gait normal. Can walk on heels and toes without difficulty. Squat was halfway down. Stance normal. Used no assistive devices. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.*" *Id.* (emphasis added). Dr. Pollack thus concluded that Plaintiff had minimal limitations in sitting, standing, or walking. Plaintiff has failed to identify any factual errors in Dr. Pollack's opinion, and the ALJ did not err in placing significant weight on her medical opinion in making his decision.

### 3. Expert Medical Testimony on Plaintiff's RFC

Plaintiff further argues that the ALJ erred by failing to obtain expert medical testimony on Plaintiff's RFC. Pl.'s Br. at 19, 21 ("It was incumbent upon the ALJ to have had a medical expert at the hearing in order to provide expert testimony to clarify what the Plaintiff's residual functional capacity was for both her Title II and Title XVI claim."). An ALJ's decision on

whether to obtain expert medical testimony, however, is discretionary and not mandatory. *See* 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) (providing that an ALJ "may" ask for, and consider, opinions from medical experts). An ALJ need only seek additional information if the present record is "inadequate" for the ALJ to determine whether a claimant is disabled. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *accord Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (2d Cir. 2012). Where, as in this case, the record already contains sufficient information for an ALJ to render a disability determination, no additional expert medical testimony is required. *Perez*, 77 F.3d at 48.

### 4. Developing the Record

Plaintiff lastly argues that the ALJ failed to develop a proper record by allegedly not eliciting sufficient testimony from Plaintiff about her medical conditions at the hearing. Pl.'s Br. at 21. An ALJ has taken "reasonable steps" to develop the record where he "asks a plaintiff's attorney at a hearing if the medical records . . . are complete, and the attorney answers affirmatively." *Orts v. Astrue*, No. 11-cv-512, 2013 WL 85071, at *3 (N.D.N.Y. Jan. 7, 2013) (citation omitted). Here, the ALJ expressly requested information about Plaintiff's medical conditions in advance of the hearing and reminded Plaintiff that it was her burden to provide such evidence. Tr. at 190 ("It is the claimant's responsibility to provide medical evidence showing that he/she has an impairment and how severe it is during the time he or she alleges disability. . . . [Y]ou should submit . . . [a]ll medical records . . . ."). Moreover, at the hearing, the ALJ offered Plaintiff and her non-attorney representative an opportunity to supplement the record with additional documentation and to object and to add to that record. *Id.* at 26, 33.

Under these circumstances, the ALJ was not required to supplement the record further. *See Orts*, 2013 WL 85071, at *3 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.").

### D. Affirming the Commissioner's Decision

Plaintiff's arguments for reversal and remand are without merit. The Commissioner's final decision, as embodied in the ALJ's September 27, 2012 decision, is supported by substantial evidence and based on the proper legal standards.[2] The Commissioner's decision must therefore be affirmed.

## III. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted, and Plaintiff's cross-

---

[2] At two isolated points in the ALJ's decision, however, the ALJ lists the March 15, 2008 alleged onset date in his analysis of whether Plaintiff should be deemed disabled under the Act. *See* Tr. at 51, 57 ("The claimant has not engaged in substantial gainful activity since March 15, 2008, the alleged onset date . . . . The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2008, through the date of this decision . . . ."). Nevertheless, first, the ALJ explicitly recognized that the proper time period for assessing Plaintiff's alleged disability began on December 11, 2010, and not March 15, 2008. Tr. at 49. That unambiguous acknowledgment of December 11, 2010 as the proper start date suggests that the two references to "March 15, 2008" in the ALJ's decision were mere typographical—and not analytical—errors. Second, even if the ALJ applied the March 15, 2008 alleged onset date in his ruling, the proper commencement date of December 11, 2010 falls within the broader March 15, 2008-September 27, 2012 time period. As a result, even if the ALJ improperly applied the March 15, 2008-September 27, 2012 time period to his ruling that Plaintiff was "not disabled," he would necessarily had to have also concluded that Plaintiff was "not disabled" during the shortened time frame from December 11, 2010-September 27, 2012. The ALJ's legal error, if any, therefore could not have affected the case disposition and was consequently harmless error. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010); *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).

motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is denied. The Commissioner's September 27, 2012 decision denying disability insurance benefits and supplemental security income to Plaintiff is affirmed.

**SO ORDERED.**

s/ Sandra J. Feuerstein
Sandra J. Feuerstein
United States District Judge

Dated: September 30, 2015
        Central Islip, New York